**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CITY OF BIRMINGHAM RETIREMENT AND RELIEF SYSTEM, on behalf of themselves and all others similarly situated, | : <br> : <br> : <br> : <br> : |
| Plaintiff, | : <br> : <br> : |
| v. | :    Case No. <br> : |
| ALAN S. ARMSTRONG, FRANK T. MACINNIS, JOSEPH R. CLEVELAND, KATHLEEN B. COOPER, JOHN A. HAGG, JUANITA H. HINSHAW, RALPH IZZO, ERIC MANDELBLATT, KEITH A. MEISTER, STEVEN W. NANCE, MURRAY D. SMITH, JANICE D. STONEY, LAURA A. SUGG, THE WILLIAMS COMPANIES, INC.,  ENERGY TRANSFER EQUITY L.P., ENERGY TRANSFER CORP LP, ENERGY TRANSFER CORP GP, LLC, LE GP, LLC, and ENERGY TRANSFER EQUITY GP, LLC, | : <br> : <br> : <br> :    JURY TRIAL DEMANDED <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : |
| Defendants. | : <br> : |

**VERIFIED CLASS ACTION COMPLAINT**

Plaintiff, the City of Birmingham Retirement and Relief System ("Plaintiff"), on behalf of itself and all others similarly situated, by its undersigned attorneys, alleges upon personal knowledge with respect to itself, and upon information and belief as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1.      This is a stockholder class action brought by Plaintiff on behalf of itself and the public stockholders of The Williams Companies, Inc. ("WMB" or the "Company") against:  (1) the WMB Board of Directors (the "Board") for breaches of fiduciary duties and

the dissemination of a materially false and misleading proxy statement in violation of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a) and 78t(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9; (2) Energy Transfer Equity L.P. ("ETE"), Energy Transfer Corp LP ("ETC"), Energy Transfer Corp GP, LLC ("ETC GP"), LE GP, LLC ("LE GP"), and Energy Transfer Equity GP, LLC ("ETE GP") for aiding and abetting those breaches of fiduciary duties and for liability as controlling persons under Section 20(a) of the Exchange Act; and (3) WMB for the dissemination of a materially false and misleading proxy statement in violation of Section 20(a) of the Exchange Act.

2.      On September 28, 2015, WMB announced that it had entered into a definitive Agreement and Plan of Merger (the "Merger Agreement") whereby WMB will merge with and into ETC (the "Proposed Transaction" or the "Merger"), with ETC remaining as the surviving entity and assuming substantially all of WMB's assets and liabilities.[1]  The Proposed Transaction has an implied value of $37.7 billion.  Pursuant to the terms of the Merger Agreement, WMB stockholders will receive, in exchange for each common share of WMB, either: (i) $43.50 in cash (the "Cash Consideration"); (ii) 1.8716 common shares representing limited partnership interests in ETC (the "Unit Consideration"); or (iii) 1.5274 ETC common shares plus $8.00 per share in cash (the "Mixed Consideration") (collectively, the "Merger Consideration").[2]  WMB will also declare a special dividend of $0.10 per share

---

[1]      Subsequently, LE GP will merge with and into ETE GP, with ETE GP surviving the merger and becoming the general partner of ETE.

[2]      The Unit Consideration and the Cash Consideration will be prorated to ensure that the aggregate number of ETC common shares and the aggregate amount of cash paid in the merger will be the same as if all WMB stockholders received $8.00 and 1.5274 ETC common shares per share of WMB common stock.

with payment contingent on the closing of the Merger in an effort to entice shareholders to vote in favor of the Proposed Transaction. Concurrently, ETE will receive ETC common shares from ETC in exchange for any cash needed to fund the cash portion of the Merger Consideration.

3.      Following the Merger, ETE will then acquire substantially all of WMB's assets and liabilities from ETC in exchange for ETE Class E units, a newly created class of units representing limited partner interests in ETE, in an amount equal to the number of ETC common shares issued to WMB stockholders in the Merger.  Thus, WMB stockholders will no longer have a direct interest in the assets it exchanged for ETC common shares. Instead, WMB is reduced to owning common units of a limited partnership that controls no material assets without any indication of what the initial trading price of these units will be.

4.      Before agreeing to the Proposed Transaction through a flawed process that severely undercuts the Company's value, WMB had several opportunities to both strengthen its position as a leader in the natural gas and midstream transportation industry and deliver substantial growth opportunities to its current stockholders. On May 12, 2015, WMB entered into an agreement to acquire all of the outstanding public units of Williams Partners L.P. ("WPZ"), a publicly traded master limited partnership (of which WMB owns approximately 60%) in exchange for 1.115 WMB shares for every WPZ unit.  Valued at $13.8 billion, this transaction would simplify the Company's overall organizational structure and, more importantly, significantly increase the Company's cash flow available for dividend and reinvestment.  Company representatives stated that they were "very excited" about the WPZ transaction and that the deal would "create tremendous value" for WMB stockholders.  But this potential was never realized.  As a strict prerequisite to the closing of

the Proposed Transaction, ETE required WMB to terminate the merger agreement with WPZ, which required WMB to pay a $428 million termination fee to WPZ.

5.      Less than a week after the announcement of the WPZ agreement, ETE made its first unsolicited offer to acquire WMB in an all-equity transaction valued at $53.3 billion with an implied price of $64.00 per WMB share.  The exchange ratio of 1.8673 ETE common units per share of WMB represented a 20% premium relative to the price of WMB common stock on May 19, 2015.  Ultimately, WMB rejected this proposal and stated multiple times that the offer "significantly undervalued" the Company.  However, after only four months, WMB completely abandoned this rationale when the Board approved the Proposed Transaction for a substantially lower price.

6.      To this end, WMB blatantly failed to maximize the value for its shareholders. WMB swiftly rejected ETE's first offer, which provided WMB stockholders with $64.00 per share and an implied value of $53.3 billion, as undervaluing the Company, but then later approved the Proposed Transaction, which delivered only $43.50 per share and an implied value of $37.7 billion.  Even with the sharp decline in commodity prices, the Company has still performed exceptionally.  The Company's "strong trajectory of growth" demands a higher price and valuation than those offered in the Proposed Transaction.

7.       Moreover, the exchange ratio of the Proposed Transaction essentially mirrors the exchange ratio of ETE's first offer, but does not reflect the rampant changes to the commodities market and respective values of both ETE and WMB.  From May 2015 to September 2015, the price of ETE common units dropped ***approximately 70%***, while WMB common shares only fell 30%.  Yet, the exchange ratio offered in the Proposed Transaction is essentially the same as ETE's original all-equity offer and does not reflect any of these

substantial changes.  As ETC is essentially a shell company without any material assets other than its newly issued Class E common units of ETE, the price of ETC units will be almost solely dependent on the price of ETE common units.  Thus, by failing to account for the recent stark price drop in ETE by including a collar on the exchange ratio, the Proposed Transaction vastly undervalues the Company and severely shortchanges WMB stockholders.

8.      In addition to the Merger Consideration, WMB stockholders will receive one contingent consideration right ("CCR") for each ETC common share exchanged in the Merger in an effort to compensate for the uncertainty of ETC's valuation and ETC's nonexistent trading history.  This is an underwhelming gesture, however, as the CCRs are not separately tradable from ETC and will not be payable for two years.  Additionally, if ETC common units satisfy certain trading metrics, the CCRs will be automatically cancelled and will have only served as an illusory filler in addition to the Merger Consideration.

9.      To further exacerbate the matter, the preliminary joint proxy statement/prospectus, which was filed with the SEC on November 24, 2015 (the "Proxy") to disseminate information in an attempt to convince WMB stockholders to vote in favor of the Merger, contained material misstatements and omissions in connection with the Proposed Transaction.  The Proxy failed to adequately disclose information concerning the sales process, the voting process, and strategic review process that the Company, the Board, and its advisors relied upon in recommending and approving the Proposed Transaction.   The Proxy does not describe the reasoning or any rationale pertaining to the Board's vote of approval.  Specifically, there is no explanation as to why Defendants Stoney and Cleveland, who previously voted against the Merger, suddenly changed their respective votes in less than a 24 hour span, which resulted in approval of the Merger by a majority of Board.  The Proxy also fails to sufficiently

describe the values and certain terms of the competing offers received during the strategic review process.  Without accurate and complete information on these matters, WMB stockholders will be forced to decide whether to vote in favor of the Proposed Transaction without all information necessary to make a fully informed decision.

10.     The Merger Agreement also contains preclusive deal protection measures which will substantially deter any competing bids from third parties.  Most notably, WMB will be required to pay a termination fee in the amount of $1.48 billion, or roughly 4% of the Proposed Transaction's value, to ETE if the Company terminates the Merger.  WMB also agreed to a "no-shop" provision, which restricts the Company's ability to solicit or discuss any alternative offers from other potential bidders.  WMB also granted ETE matching rights pursuant to the Merger Agreement, which requires WMB to notify ETE within 24 hours of receipt of any alternative third party proposal.  ETE is then afforded up to three business days to renegotiate for more favorable terms before WMB is allowed to change its recommendation on the Merger in favor of an alternative bid.

11.     The Proposed Transaction is also flawed due to the obvious conflicts of interest of WMB's financial advisors, Barclays and Lazard.  Barclays was previously engaged by ETE to advise on over 28 separate financial transactions since 2012, all of which were disclosed to the Board.  Also, the payment of the majority of Lazard's $23 million services fee is contingent upon the closing of the Merger.  Due to these obvious conflicts, neither Barclays nor Lazard opined on the true standalone value of WMB in comparison to the Proposed Transaction.  Thus, as the Board was well aware of these significant conflicts and took no action to engage any other financial advisors, the Board failed to provide stockholders with sufficient expert opinions from which they could make an informed vote on the Merger.

## PARTIES

12.     Plaintiff is a stockholder of WMB and has been a stockholder of WMB at all relevant times alleged in this Complaint.

13.     Defendant Alan S. Armstrong ("Armstrong") has served as President, CEO, and as a director of WMB since January 2011.   Armstrong voted against the Proposed Transaction.

14.     Defendant Joseph R. Cleveland ("Cleveland") has served as a WMB director since 2008.  On September 24, 2015, Cleveland voted with a majority of the Board against the Proposed Transaction.   After a dinner meeting on September, 25, 2015, Cleveland changed his vote in favor of the Proposed Transaction.

15.     Defendant Kathleen B. Cooper ("Cooper") has served as a director of WMB since 2006.  Cooper voted against the Proposed Transaction.

16.     Defendant John A. Hagg ("Hagg") has seved as a director of WMB since 2012.  Hagg voted against the Proposed Transaction.

17.     Defendant Juanita H. Hinshaw ("Hinshaw") has served as a WMB director since 2004.  Hinshaw voted against the Proposed Transaction.

18.     Defendant Ralph Izzo ("Izzo") has seved as a WMB director since 2013. Izzo voted in favor of the Proposed Transaction.

19.     Defendant Frank T. MacInnis ("MacInnis") has seved as a WMB director since 1998.  MacInnis is Chairman of the Board.  MacInnis voted in favor of the Proposed Transaction.

20.     Defendant Eric W. Mandelblatt ("Mandelblatt") has been a WMB director since 2014.   Mandelblatt controls the general partner of Soroban Master Fund LP

("Soroban") and is also the managing partner and chief investment officer of Soroban's investment manager, Soroban Capital Partners LLC. As of November 13, 2015, Soroban effectively owns and controls over 41 million shares of WMB common stock. Mandelblatt voted in favor of the Proposed Transaction.

21.     Defendant Keith A. Meister ("Meister") has been a WMB director since 2014. Meister is the managing partner and chief investment officer of Corvex Management LP ("Corvex"). Meister also controls the general partner of Corvex. As of November 13, 2015, Corvex effectively owns and controls 21 million shares of WMB common stock. Meister voted in favor of the Proposed Transaction.

22.     Defendant Steven W. Nance ("Nance") has served as a WMB director since 2012. Nance was a member of the strategic review committee. Nance voted in favor of the Proposed Transaction.

23.     Defendant Murray D. Smith ("Smith") has served as a WMB director since 2012. Smith voted against the Proposed Transaction.

24.     Defendant Janice D. Stoney ("Stoney") has served as a WMB director since 1999. Stoney was a member of the strategic review committee. On September 24, 2015, Stoney voted with a majority of the Board against the Proposed Transaction. After a dinner meeting on September, 25, 2015, Stoney changed her vote in favor of the Proposed Transaction.

25.     Defendant Laura A. Sugg ("Sugg") has served as a WMB director since 2010. Sugg was a member of the strategic review committee. Sugg voted in favor of the Proposed Transaction.

26.     Defendants Armstrong, Cleveland, Cooper, Hagg, Hinshaw, Izzo, MacInnis, Mandelblatt, Meister, Nance, Smith, Stoney, and Sugg are collectively referred to herein as the "Board" or the "Individual Defendants."

27.     Defendant The Williams Companies, Inc. (defined above as "WMB") is a corporation incorporated under the laws of the State of Delaware with its principal executive offices located in Tulsa, Oklahoma.

28.     Defendant Energy Transfer Equity, L.P. (defined above as "ETE") is a Delaware limited partnership with its principal executive offices located in Dallas, Texas. ETE is publicly traded on the New York Stock Exchange under the ticker symbol "ETE."

29.     Defendant Energy Transfer Corp LP (defined above as "ETC") is a Delaware limited partnership with its principal executive offices located in Dallas, Texas.

30.     Defendant Energy Transfer Corp GP, LLC (defined above as "ETC GP") is a Delaware limited liability company with is principal executive offices located in Dallas, Texas.  ETC GP is the general partner of ETC.

31.     Defendant LE GP, LLC (defined above as "LE GP") is a Delaware limited partnership with is principal executive offices located in Dallas, Texas.  LE GP is the general partner of ETE.

32.     Defendant Energy Transfer Equity GP, LLC (defined above as "ETE GP") is a Delaware limited liability company with its principal offices located in Wilmington, Delaware.  ETE GP is a wholly owned subsidiary of ETC and will become the general partner of ETE upon completion of the Merger.

33.     Defendants ETE, ETC, ETC GP, LE GP, and ETE GP are collectively referred to herein as the "ETE Defendants."

## JURISDICTION AND VENUE

34.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331, as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.  The Court has supplemental jurisdiction over any claims arising under state law pursuant to 28 U.S.C. § 1367(a).

35.     This Court has personal jurisdiction over each Defendant named herein because each Defendant is an individual, corporation, partnership, or limited liability company that has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

36.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Furthermore, the Company is incorporated in this District.

## FACTUAL ALLEGATIONS

### *Background of WMB*

37.     WMB was founded in 1908, originally incorporated in the state of Nevada in 1949, and reincorporated in the state of Delaware in 1987.  As an industry leader in energy infrastructure, WMB is a premier provider of the large-scale infrastructure responsible for connecting North America's natural gas supply and natural gas products to the growing global demand for clean fuels and feedstock.  Most of WMB's midstream interests are held through its investment in WPZ, which is an industry-leading master limited partnership that focuses on transporting natural gas and other natural gas products throughout North America.  WMB is the general partner of WPZ and owns approximately 60% of WPZ

common units.  Collectively, WMB operates more than 33,000 miles of natural gas and oil pipelines across North America, including the Company's 10,000 mile Transco network of natural gas pipeline which is crucial fuel link between Texas and the northeastern states. WPZ operations touch approximately 30 percent of U.S. natural gas.

***WMB's Strong Performance***

38.     Even with the current uncertainty and instability of the commodities markets, WMB has continued to deliver strong financials in 2015.

39.     On April 29, 2015, the Company reported its financial results for the first quarter of 2015.  WMB reported an adjusted EBITDA of $918 million, a 12 percent increase from the first quarter of 2014.  This quarter's main accomplishment was the completion of the ACMP-WPZ merger, which furthered WMB's long term position for its growing division of fee-based revenue projects.[3]  CEO Armstrong specifically noted that "this quarter's results also show very strong underpinning of growth in our fee-based revenues that will drive our growth for many years to come."

40.     On July 30, 2015, the Company reported its financial results for the second quarter of 2015.  WMB reported an adjusted EBITDA of $1.02 billion, an increase of $247 million, or 32%, from the second quarter of 2014.  CEO Armstrong described this quarter as a period of "tremendous growth" for the Company with a "strong trajectory of growth in front of us."   Again, Armstrong recognized WMB's fee-based revenue projects as the primary driver of increased growth and revenues, noting that "our fee-based revenue growth

---

[3]     On February 2, 2015, WPZ merged with Access Midstream Partners ("ACMP").  ACMP provides midstream services to producers across the United States, including natural gas and liquids gathering, treating, and processing.

really is coming through in a big way and [it's] pretty powerful the way it overpowered lower commodity prices in the quarter."

41.     Most recently, on October 28, 2015, the Company reported its financial results for the third quarter 2015.  WMB reported an adjusted EBITDA of $1.1 billion, a $195 million (21%) increase from the third quarter 2014.  CEO Armstrong stated that:

> Our strong third quarter results underscore the effectiveness of our strategy to connect the best natural gas supplies to the best markets with fee-based infrastructure, which accounted for more than 90 percent of our gross margin. Williams Partners achieved record distributable cash flow and delivered adjusted EBITDA growth across four of the partnership's five operating areas.

42.     Most importantly, the Company's fee-based revenue projects and overall growth has continued to trump any persistent deficiencies in the commodity markets. Armstrong stated that:

> *despite the fundamental pressures on our industry from dramatically lower commodity prices, we've continued with very substantial growth in our adjusted EBITDA and DCF*, so really, really showing the strength as we continue to see prices erode and some really dramatically low NGL prices in the quarter, *but our strategy of continuing to invest in these big fee-based projects is really starting to overwhelm those lower prices.*

43.     Additionally, throughout WMB's reported financials in 2015 and also at the Company's Analyst Day on May 13, 2015, the Company has repeatedly offered both guidance and extreme optimism about the Company's dividend growth for the next three years, with an expected dividend growth rate of 10 to 15 percent for 2015 through 2017. Specifically, WMB executives were most excited about the potential positive effects that would result from the WPZ merger.  The WPZ transaction would allow the Company to extend the duration of its high dividend growth into 2020 due to "an enhanced growth profile as a result of this lower cost of capital and . . . the absence of incentive distribution

rights."  CFO Chapel also noted that the WPZ merger would immediately raise dividend guidance for 2016 to $2.85, a 6.5% increase.

44.     Also at WMB's Analyst Day, Armstrong further lauded the Company's strong growth potential in terms of WMB's unique stronghold on the natural gas space:

> [T]his is, I think, the spot in the natural gas space to be in. . . . ***We think the natural gas market is going to continue to expand*** . . . We think we're in those spots and we have a very identified set of growth trajectory and growth projects that drive this trajectory for a very long time.  And frankly, I think we're very unique in that regard in terms of having so much of that growth actually pinned down in identified projects. . . . And I'll be very disappointed if we don't exceed that in terms of the growth opportunities that are out there in front of us.

45.     Given WMB's continued strong performance in light of the unstable commodity markets, coupled with the Company's trending growth and planned expansion, the Proposed Transaction could not have occurred at a more opportune time for ETE.

***The Background of the Merger***

### ETE's Initial Indication of Interest

46.     In February 2014, Kelcy Warren ("Warren"), Chairman of the board of directors of LE GP (ETE's general partner), contacted WMB CEO and director Alan Armstrong and expressed an interest in exploring a combination of ETE and WMB.  Nine months later, in November 2014, ETE made an informal indication of interest through one of WMB's financial advisors, Barclays.  ETE's informal indication of interest was discussed at a special meeting of the WMB Board on December 5, 2014.  The Board concluded that, in light of the pending merger between ACMP and WPZ, it was not in the best interest of WMB stockholders to engage with ETE at that time.  The Board also requested that WMB management and Barclays prepare an overview of ETE and its affiliates along with a review of other strategic opportunities, which was presented at the Board's special meeting on December 18, 2014.

47.     At a regular Board meeting on January 20, 2015, Barclays made a presentation on strategic opportunities available to WMB.  After the Board discussed these strategic alternatives, the Board determined to contact ETE after the completion of the ACMP-WPZ merger to learn more about ETE's interest in a combination with WPZ.

48.     After a few brief telephone calls between Armstrong and Warren, WMB's Board determined that Armstrong and Warren should meet to discuss general industry issues and that WMB would consider any strategic proposal.  At a March 5, 2015 Board meeting, the Board discussed WMB's potential acquisition of all of the public outstanding common units of WPZ and a potential combination with ETE.

**WMB's Board Discusses a Potential Acquisition of WPZ**

49.     On April 2, 2015, the Board met to discuss a potential merger with WPZ, instructing management and Barclays to present the terms of a potential WPZ merger to the WPZ Board and ask the WPZ conflicts committee to engage advisors to evaluate and negotiate the potential WPZ merger.  Later that day, the WPZ conflicts committee was delegated authority to evaluate the potential WMB-WPZ merger.

50.     Between April 2, 2015 and May 12, 2015, representatives of WMB and WPZ's legal counsel negotiated and finalized the terms of a merger agreement between WMB and WPZ.

51.     On May 6, 2015, Armstrong and Don Chappel (Senior Vice President and CFO of WMB) ("Chappel") attended a dinner with Warren and Jamie Welch (Group CFO and Head of Business Development of LE GP) ("Welch") at Warren's home in Dallas, Texas to discuss various topics related to a potential merger of WMB and ETE.  While Armstrong affirmed he would discuss any ETE offer with the WMB Board, he noted the strength of WMB's focus on a

natural gas infrastructure strategy, as opposed to a diversified services strategy.  No formal offer was conveyed by any of the parties at this meeting.

52.     At a Board meeting on May 12, 2015, the Board discussed the proposed WPZ merger whereby WMB would acquire all of the outstanding public stock of WPZ in an all stock-for-unit transaction at a ratio of 1.115 shares of WMB common stock per common unit of WPZ. The Board also discussed WMB's right to terminate the WPZ merger upon payment of a $410 million termination fee to WPZ (through a waiver of a portion of WPZ GP LLC's incentive distributions).  After Barclays presented its opinion at the meeting that the WPZ merger was fair from a financial point of view to WMB, the WMB Board unanimously approved the WPZ merger agreement and unanimously recommended that WMB shareholders vote in favor of the deal.    That same day at a special meeting of the WPZ Board, upon the unanimous recommendation of the WPZ conflicts committee, the WPZ board unanimously approved the WPZ merger agreement.  Later that day, WMB and WPZ executed the WPZ merger agreement. The market responded favorably to the deal, with WMB's shares rising 6.5% on the news.

### ETE's $64.00 Offer

53.     On May 19, 2015, Armstrong received a letter from Warren containing ETE's proposal to acquire WMB in an all equity transaction at an implied price of $64.00 per share of WMB common stock.  This offer represented a 20.6% premium to WMB's closing price of $53.08 on May 19, 2015.  The letter stated that the equity to be received by WMB stockholders would consist of shares of a new corporation, ETC, that would only own ETE common units and that would be publicly traded on the NYSE and would mirror the economic aspects of ETE common units.  Warren's letter also conditioned the offer on the termination of the WPZ merger agreement and further indicated that ETE would agree to a "hell or high water" regulatory

standard in the definitive agreement.  The Proxy does not provide any additional information on this "hell or high water" regulatory standard.

54.     At a May 21, 2015 Board meeting, WMB's Board, management and advisors discussed ETE's offer.  Barclays noted at this meeting that it had a separate team that advised and provided services for ETE from time to time, but that team was not involved in advising ETE with respect to its current proposal to WMB.  Despite Barclays extensive relationship with ETE and its affiliates (described in greater detail below), the Board determined that Barclays should continue to advise WMB on this matter.  On June 15, 2015, WMB formally engaged Barclays and a second financial advisor, Lazard Freres & Co. ("Lazard"), to act as financial advisors in connection with ETE's offer.

### WMB Directors' Concerns with the WPZ Merger Process

55.     After "a couple" of WMB directors raised concerns on May 29, 2015 regarding whether all material information had been provided to the WMB Board in connection with its approval of the WPZ merger agreement, a special meeting of the Board was called to discuss these concerns.  The Proxy fails to provide any additional information as to which Board members initially raised these concerns and the nature of the material information that may not have been provided to WMB's Board.  At that special meeting on June 1, 2015, the Board appointed a "director inquiry panel," led by director Dr. Kathleen Cooper[4], which was tasked with "ascertaining whether the WMB board had been provided with all material information necessary in connection with the approval of the WPZ merger and to determine whether it had all material information necessary to assess ETE's proposal."  The Proxy fails to provide any

---

[4]     Directors Ralph Izzo and Steven Nance were appointed to the director inquiry panel the next day.

additional information as to which Board members initially raised these concerns and the nature of the material information that may not have been provided to WMB's Board.

56.    After Warren sent a letter to WMB on June 10, 2015 reiterating ETE's proposal at an implied price of $64.00 per share, the Board met on June 11, 2015 to discuss a response.  The Board determined that the director inquiry panel should complete its investigation prior to the Board responding to ETE's proposal.

57.    At a special meeting of the Board on June 15, 2015, the director inquiry panel reported its conclusion that "the WMB Board had all material information prior to approving the WPZ merger agreement and had all material information necessary to assess ETE's proposal." The Proxy does not discuss how the director inquiry panel arrived at this conclusion or any other details related to its investigation.

### The Board Rejects ETE's $64.00 Offer and Announces a Strategic Alternatives Review Process

58.    In a letter to WMB dated June 18, 2015, ETE again reiterated its proposal to acquire all of WMB's common shares at an implied price of $64.00 in a letter to WMB's Board. The letter confirmed the terms of ETE's prior proposal, including: (1) the equity to be received by WMB stockholders in the proposed transaction would consist of a fixed number of shares of a new limited partnership entity that would elect to be treated as a corporation for tax purposes, would own no assets other than ETE common units and would be publicly traded on the NYSE, (2) the offer was contingent on the termination of the WPZ merger agreement, and (3) ETE would agree to a "hell or high water" regulatory standard in the definitive merger agreement. The letter stated that this would be ETE's last attempt to engage with the WMB Board in a non-public setting unless the Board responded by 9:00 a.m. on June 22, 2015.

59.     At a Board meeting on June 20, 2015, WMB's advisors, Barclays and Lazard, presented their analyses of ETE's proposal.  Notably, ETE's $64.00 offer represented a 32.4% premium to WMB's closing price of $48.34 on Friday, June 19, 2015.  After the Board discussed these analyses, the Board authorized management to inform ETE that its proposal did not warrant further discussions regarding a potential transaction, and that the proposal "significantly undervalued" WMB.  The Board also authorized management to publicly announce that WMB was commencing a process to explore a range of strategic alternatives.  In this regard, the Board formed a strategic review committee comprised of directors Steven Nance, Janice Stoney, and Laura Sugg.  Also at this meeting, Barclays discussed its relationships since 2012 with ETE, WMB, and WPZ, and their respective affiliates, along with the compensation that Barclays had received for providing advice or services to these entities.  Again, though Barclays had performed an extensive array of services for ETE and its affiliates, Barclays was allowed to remain as WMB's advisor.

60.     On June 21, 2015, Armstrong sent a letter to Warren stating that ETE's offer did not provide an adequate basis on which to begin discussions regarding a potential transaction and would not deliver value commensurate with what WMB expected to achieve on a standalone basis and through other growth initiatives, including the WPZ merger.  The letter further invited ETE to participate in WMB's strategic review process.  WMB issued a press release later that day announcing the Board's rejection of ETE's proposal (without naming ETE as the bidder) and further announcing the commencement of the strategic review process.  Later that day, Armstrong assured the chair of the WPZ conflicts committee that WMB intended to follow through with the WPZ merger.

61.     The strategic review committee (along with members of WMB management and financial and legal advisors) met telephonically on June 22, 2015 to discuss the process and timing of the strategic alternatives review process.  The strategic review committee authorized representatives of WMB, Barclays and Lazard to contact 18 potential counterparties, including ETE, and five other strategic parties to solicit their interest in participating in the strategic alternatives review process.  Also discussed at this meeting were other potential strategic alternatives available to WMB, including the WPZ merger and other standalone alternatives.

62.     The strategic alternatives review process played out over the next several weeks as potential counterparties were contacted.  In cases where potential bidders indicated interest, those bidders were provided with a bid instruction letter relating to a first round, non-binding indication of interest to acquire 100% of the capital stock of WMB, with a July 27, 2015 deadline.  During this time, though WMB management proposed retaining a separate financial advisor to analyze WMB's standalone alternatives, the Board determined that Barclays and Lazard would provide an analysis on these matters.  A number of the potential counterparties engaged with the strategic review committee and signed confidential disclosure agreements.  ETE resisted a confidential disclosure agreement that included a "standstill" provision, and after extensive negotiations on this point, WMB removed any reference to a standstill.  A confidentiality agreement between WMB and ETE was eventually signed on July 16, 2015.

63.     The Proxy vaguely notes: "On July 9, 2015, Mr. Thomas Mason, Senior Vice President, General Counsel and Secretary of ETP, sent a letter to WMB on behalf of ETE regarding WMB's operations and the potential effects on a combination between WMB and ETE in light of the existing conditions in the market for natural gas liquids."  The Proxy fails to discuss what "the existing conditions in the market for natural gas liquids" were, nor does it

discuss the potential effects of a combination between WMB and ETE (e.g. whether this would affect the combination positively or negatively, and whether this would result in ETE adjusting its bid for WMB).

64.     On July 17, 2015, Barclays provided WMB a "relationship disclosure summary," which included information related to Barclays' relationships since 2012 with various potential bidders, together with the approximate compensation it had received for services or advice to these parties.

65.     Diligence materials, electronic data rooms, and management presentations were provided to potential counterparties in July, August, and September of 2015.

66.     On July 20 and 27, 2015, Barclays and Lazard discussed potential standalone strategic alternatives (and the status of each advisor's financial analysis with respect to those alternatives) with WMB management, but not with the WMB Board.

67.     On July 22, 23, and 24, 2015, MacInnis, Sugg, and other representatives of WMB met with a representative of 20 WMB stockholders and two other institutional investors to discuss the WMB stockholders' perspectives on the strategic alternatives process.   Discussions with seven other WMB stockholders occurred on August 13, 2015.  The Proxy fails to disclose any additional details concerning these meetings, including whether the stockholders supported WMB's approach.

**WMB Receives Proposals from ETE, Party A, and Party B**

68.     On July 27, 2015, WMB received non-binding indications of interest from three parties: ETE, Party A, and Party B.  ETE proposed to acquire all shares of WMB common stock in exchange for 1.8716 ETC common shares per share of WMB common stock, contingent on termination of the WPZ merger agreement.  Based on ETE's closing price of $28.96 on July 27,

2015, this exchange ratio implies a price of $54.20 per WMB common share.  Up to this point, ETE's offer was based on an implied value of $64.00 per WMB share, and the Proxy fails to explain why ETE revised its offer that resulted in a decrease of almost $10 per WMB share. Party A proposed to acquire all of the shares of WMB common stock in exchange for a specified number of Party A shares, though the Proxy does not provide the implied value of that proposal. Party B proposed to acquire all of the shares of WMB common stock via a "double dummy" merger structure in which a new corporation would own both WMB and Party B and the WMB stockholders and Party B would own 35% and 65%, respectively, of the new corporation.  Again, the Proxy does not provide the implied value of that proposal.  Neither Party A nor Party B's proposals were contingent on termination of the WPZ merger.

69.     On July 31, 2015, the strategic review committee, along with members of WMB management and the Company's legal and financial advisors, discussed these proposals.  While the strategic review committee believed that ETE's and Party A's proposal could be the basis for an attractive potential transaction, Party B's proposal was not seen as offering a premium to WMB stockholders.  Based on Barclays and Lazard's recommendations, the strategic review committee concluded that ETE and Party A, but not Party B, should be invited to participate in the second round of the strategic alternatives review process.  During the next few days Lazard discussed with ETE various matters related to its proposal, including concerns with ETE's proposed transaction structure and the value of its offer.  Lazard discussed with Party A various matters related to its proposal, including regulatory concerns.  Notably, the Proxy does not state that WMB's representatives discussed concerns over the value of Party A's offer.  Barclays informed Party B that its offer was not competitive and that Party B would most likely not be invited to continue with the process.

70.     In August 2015, WMB management prepared additional WMB forecasts (with the assistance of Barclays and Lazard) to consider the potential effects of changing market conditions, including lower commodity prices.

71.     On August 1, 2015 representatives of WMB and its legal and financial advisors discussed with representatives of ETE and its legal and financial advisors various transaction and tax issues related to ETE's July 27, 2015 proposal.   After the discussion, WMB's advisors concluded that ETE's proposal raised concerns regarding the economic equivalence of ETC common shares and ETE common units with respect to likely future distributions.   That same day, WMB and its legal counsel discussed with Party A and its legal counsel regulatory concerns raised by Party A's proposal.   Over the next several weeks, the implications of these issues as well as potential solutions were discussed internally among WMB and its advisors, as well as with each of ETE and Party A.   WMB's legal counsel also began exchanging drafts of merger agreements with ETE and Party A over this time.

**The Second Round of the Strategic Alternatives Review Process**

72.     ETE and Party A were formally invited to participate in the second round of the strategic alternatives review process on August 3, 2015, where each party was invited to submit a final bid to acquire 100% of WMB's capital stock by August 24, 2015.

73.     On August 21, 2015, WMB's legal counsel called ETE's legal counsel to provide feedback on how ETE could revise its proposal to become more competitive with Party A.   This call is but one example of how WMB went out of its way to favor ETE over Party A during the strategic alternatives review process, at the expense of WMB shareholders.

74.     On August 23, 2015, WMB's and Party A's legal counsel discussed the regulatory risks with Party A's proposal and the treatment of the WPZ merger agreement, which would

need to be amended if Party A's bid were accepted by WMB.  Party A's counsel indicated that it would be difficult for Party A to submit its final bid without further guidance from WMB on these matters.   The next day, the strategic review committee authorized WMB representatives to provide Party A with this information.

75.     ETE submitted its revised proposal to WMB on August 24.  The letter reiterated ETE's proposed exchange ratio of 1.8716 ETC common shares for each share of WMB common stock but also indicated that ETE was prepared to include a cash component of approximately $6.05 billion as part of the proposed consideration.  Again, the Proxy fails to provide the implied per share value of WMB's shares, $50.08, based on the exchange ratio and ETE's closing price of $26.76 on August 24, 2015.  The Proxy fails to explain why ETE revised its offer that resulted in a decrease of over $4 per WMB share as compared to its prior proposal, and was more than $14 less than its original $64 proposal.   ETE's declining stock value likely precipitated the company's inclusion of a cash component to the deal consideration.

76.     At an August 25, 2015 meeting of the strategic review committee, WMB's advisors noted that ETE had not addressed concerns regarding the economic equivalence of ETC common shares and ETE common units.  The strategic review committee discussed how these issues could be effectively communicated to ETE, and WMB went out of its way to favor ETE in the process by allowing Board members Laura Sugg and Keith Meister to communicate with ETE.  Meister, who had expressed his willingness to help communicate the WMB Board's points to ETE, was authorized to call Warren and communicate the following three concerns that the WMB Board needed ETE to address in order for the WMB Board to consider ETE's bid as a viable strategic alternative: (1) ETE would need to address WMB's concerns regarding the economic equivalence of ETC common shares and ETE common units, (2) ETE would need to

improve the overall economics of its proposal, and (3) in order to increase transaction certainty, ETE would need to agree to negotiate exceptions to the definition of "material adverse effect" under the merger agreement.  Meister and Sugg called Warren on August 27, 2015 to inform him of these concerns.

### Party A Revises Its Proposal

77.     On August 26, 2015, Party A delivered to WMB a term sheet setting forth revised terms upon which Party A would be willing to proceed with the WPZ merger agreement, which included a reduction in the proposed per share consideration to WPZ unitholders.  The reduction was due in part to recent market conditions.

78.     At a meeting of the strategic review committee on August 26, 2015, the committee and its advisors discussed Party A's revised offers, noting that the WPZ conflicts committee would likely need to conduct additional diligence on Party A to evaluate its proposal. The next day, Armstrong encouraged Party A to delay the submission of its final bid until the WPZ conflicts committee had adequate time to evaluate Party A's offer and the parties had further discussed the regulatory issues raised by the potential transaction or, alternatively, to refrain from submitting an offer that was contingent on WMB responding to Party A in a very short period of time.

79.     Later on August 27, 2015, Party A sent a revised proposal to WMB, which reduced the exchange ratio payable to WMB stockholders compared to the exchange ratio proposed by Party A in its July 27 communication and increased the exchange ratio that would be payable to WPZ unitholders compared to Party A's August 26 term sheet.  Party A's proposal also stipulated that the offer would be withdrawn if WMB and Party A had not executed a merger agreement by 5:00 p.m. on August 29, 2015.  WMB responded by stating that they would

be willing to further explore a potential transaction, but that WMB would not be able to enter into a merger agreement by the specified deadline.  Shortly thereafter, Party A and WPZ began discussing due diligence.

80.     On August 28, 2015, WMB received a letter from Warren regarding the three concerns that Sugg and Meister has raised the day before. In the letter, ETE proposed that for each ETC common share received by a WMB stockholder in the transaction, such WMB stockholder would also receive one CCR to address the trading equivalence issue raised by WMB. The letter also set forth certain proposed terms for the CCRs, including that the amount payable under each CCR would be capped at $2.00.  Later that day at a meeting of the strategic review committee, WMB's advisors noted that, if properly structured, the CCRs could help address concerns regarding the economic equivalence of ETC common shares and ETE common units.  The Proxy then states that Barclays and Lazard "noted certain key concerns with ETE's proposed structure of the CCRs," but the Proxy does not state what those concerns were.

81.     On August 30, 2015, Party A's legal advisor advised WMB's legal advisor that, because the August 29 deadline had passed, Party A's offer had been withdrawn.  During a Board meeting the next day, WMB's advisors stated their belief that Party A would likely re-engage if representatives of WMB contacted Party A.  Despite this belief, it appears that WMB never made any attempt to re-engage with Party A.

82.     The Proxy notes that in August and September of 2015, "WMB management ran business case models, with the input of Barclays and Lazard, to reflect current commodities prices, the concentration of customer credit risk and perception of access to capital markets, to aid in its analysis of the offers made in the strategic review process."  Knowing that ETE had already effectively lowered its offer twice, it is likely that these revised models would show a

more pessimistic outlook for WMB, which would help justify ETE's shrinking offer consideration.

83.    At a Board meeting on September 3, 2015, the WMB Board and its advisors discussed the potential ETE transaction and the potential Party A transaction.  The Proxy notes that the Board did not believe that the CCRs sufficiently addressed concerns regarding the economic equivalence of ETC common shares and ETE common units.  Despite this, WMB's advisors believed that ETE's offer would receive strong support from WMB stockholders and that WMB stockholders would likely not approve the WPZ merger if ETE's offer was outstanding.  The Board then determined not to proceed with Party A's proposal and to engage in more detailed discussions with ETE.  To that end, the Board authorized MacInnis, Armstrong, Meister, and Chappel to meet with Warren and discuss three key terms of ETE's proposal:  (1) the equivalence of ETC common shares with ETE common units, (2) the price offered by ETE's exchange ratio of 1.8716 ETC common shares per share of WMB common stock, and (3) the exceptions to the definition of "material adverse effect" under the merger agreement.  That meeting occurred the next day.  In a follow up phone call the day after between MacInnis and Warren, MacInnis asked that Warren consider increasing the exchange ratio of ETE's proposal to 2.0 ETC common shares per share of WMB common stock.

84.    On September 8, 2015, Warren sent MacInnis a revised proposal.  While the 1.8716 exchange ratio remained the same, ETE stated that ETC shareholders would be entitled to receive a quarterly distribution on each ETC common share from the closing of the transaction through December 31, 2018.  The letter also stated that the CCRs would be stapled to the ETC common shares and not separately tradable, though there would be no cap on the amount payable pursuant to the CCRs.  The letter also authorized WMB to declare a one-time special cash

26

dividend in the amount of $0.10 per WMB share prior to the closing of the transaction. Additionally, with respect to the $6.05 billion cash component, ETE would require that the consideration be prorated to allocate the entire cash component even if the cash consideration was undersubscribed by WMB shareholders.

85.     Over the next several weeks, the parties and their representatives negotiated the terms of the merger agreement, conducted due diligence, and continued to discuss key open items.  The parties also discussed post-closing governance, but it is unclear from the Proxy if the continued employment of WMB employees was discussed.  On September 21, 2015, Sugg called Welch to discuss certain issues in advance of LE GP's board meeting scheduled for the following day, including: (1) concerns related to the equivalence of ETC common shares with ETE common units, (2) improving the overall consideration of ETE's offer, and (3) ETE's agreement to the exceptions requested by WMB to the definition of "material adverse effect" under the merger agreement.

86.     Also on September 21, 2015, a representative of Party C contacted Armstrong to discuss that company's interest in purchasing the publicly held outstanding common units of WPZ at a premium with a right for Party C to exchange those common units of WPZ for shares of WMB common stock at a fixed exchange ratio and receive the tax basis step-up from the purchase and certain unspecified governance rights.  Party C's preliminary indication of interest was discussed at a special meeting of the Board on September 24, 2015, wherein WMB's advisors noted that Party C could quickly provide the WMB Board with a firm offer if Party C was serious.  Barclays and Lazard were then authorized by the Board to obtain more information from Party C, who immediately did so and reported back to the Board.  After discussion, the Board concluded that Party C's offer would not be viable and was not worthy of further

deliberation.  The Proxy provides no further information on Party C's offer, and it is thus unclear what the economics of the offer entailed and why the Board determined that Party C's offer was not a viable alternative.

87.    On September 23, 2015, ETE sent WMB a letter which confirmed that ETE's most recent offer was on its best and final terms.  Based on ETE's closing price of $23.95 on September 23 and the exchange ratio of 1.8716, ETE's offer would be worth $44.82 per WMB share.  With WMB shares closing that day at $42.47 per share, ETE's offer represented a premium of just 5.5%.

### A Majority of the Board Initially Votes Against the ETE Proposal

88.    At the special meeting of the Board on September 24, 2015, the Board, management, and WMB's advisors discussed ETE's final offer, received the previous day.  Among the Board's considerations was the reaction of WMB investors if the Board rejected ETE's offer, along with issues related to the WPZ merger agreement if WMB decided to pursue the ETE transaction.  When the Board ultimately voted on ETE's proposal, seven members of the Board (CEO Armstrong, Cleveland, Cooper, Hagg, Hinshaw, Smith, and Stoney), a full majority, were against ETE's proposal.  Six members of the Board (MacInnis, Izzo, Mandelblatt, Meister, Nance, and Sugg) were in favor of proceeding with it.

89.    While the WMB Board at this point should have informed ETE that it could not accept ETE's inadequate offer, the Board again went out of its way in support of ETE's proposal.  The Proxy notes that the Board "determined to recess the meeting to give the members of the WMB Board an opportunity to reflect further upon the strategic alternatives review process and the potential alternatives."  The Board then broke into two groups for dinner meetings, where the participants continued to discuss the strategic alternatives review process, including the pros and

cons of proceeding with a standalone strategy versus proceeding with the potential ETE transaction. The proxy does not provide any reason why the Board split into two groups to continue these discussions, who was in each group, or any other details related to these dinner meetings.

### After the Mysterious Dinner Meetings, a Majority of the Board Votes in Favor of the ETE Proposal

90.     The special meeting of the Board was reconvened the next day. This time when the Board voted on the ETE proposal, eight members of the Board (MacInnis, Cleveland, Izzo, Mandelblatt, Meister, Nance, Stoney, and Sugg) supported the proposal, while only five members of the Board (Armstrong, Cooper, Hagg, Hinshaw, and Smith) opposed the proposal. The Proxy gives no additional information as to why Board members Cleveland and Stoney decided to change their vote, ultimately leading to the WMB Board's approval of the ETE proposal. The Board then authorized WMB management and advisors to finalize the terms of the ETE proposal. Later on September 25, 2015, WMB's legal counsel called WPZ's legal counsel to provide notification that the Board intended to change its recommendation concerning the WPZ merger agreement.

91.     On September 26, 2015, a meeting of the strategic review committee was telephonically convened. Among the issues discussed were "open terms concerning the governance of ETC," though the Proxy provides no further details on this point, including whether the continued employment of ETE employees was discussed.

92.     Also on September 26, 2015, WMB's legal counsel sent WPZ's legal counsel a draft termination agreement and release for the termination of the WPZ merger agreement and a draft amendment to WPZ's partnership agreement. These drafts provided that, consistent with the WPZ merger agreement, WPZ GP LLC, WPZ's general partner, would waive $410 million

29

of its incentive distributions in an amount not to exceed $102.5 million in any one fiscal quarter. After a number of conference calls among the parties, the WPZ conflicts committee ultimately agreed to terminate the WPZ merger agreement in exchange for an increase in the termination fee payable thereunder from $410 million to $428 million through a waiver of WPZ GP LLC's incentive distributions in an amount not to exceed $209 million in any one fiscal quarter. The Proxy does not state why WMB agreed to pay a termination fee to WPZ in excess of the amount specified in the WPZ merger agreement without allowing WPZ to first renegotiate the terms of the WPZ merger agreement, even though WPZ was entitled to engage in such renegotiations.

93.     On September 28, 2015, at a special meeting of the Board convened for the purpose of approving the Proposed Transaction, WMB's financial advisors rendered their oral fairness opinions to the Board. While both Barclays and Lazard opined that the merger consideration to be offered to WMB stockholders in the ETE transaction was fair from a financial point of view to WMB stockholders, neither financial advisor opined that the Proposed Transaction was better than the Company's standalone prospects. In fact, as discussed in greater detail below, both Lazard's and Barclays' written fairness opinions expressly disclaimed any opinions as to the value of the Company's standalone prospects. Despite this fact, a majority of WMB's Board (including MacInnis, Cleveland, Izzo, Mandelblatt, Meister, Nance, Stoney, and Sugg) (a) determined to approve the merger agreement with ETE and recommend that WMB stockholders vote in favor of the Proposed Transaction, and (b) determined to terminate the WPZ agreement. Directors Armstrong, Cooper, Hagg, Hinshaw, and Smith opposed these resolutions. Later that day, WMB and ETE executed the merger agreement and issued a joint press release announcing the proposed transaction, and the WPZ merger agreement was terminated.

**The Proposed Transaction Is Announced**

94.     The press release announcing the merger stated in part:

DALLAS & TULSA, Okla.--(<u>BUSINESS WIRE</u>)--Energy Transfer Equity, L.P. (NYSE:ETE) ("ETE") and The Williams Companies, Inc. (NYSE:WMB) ("Williams" or "WMB") today announced a business combination transaction valued at approximately $37.7 billion, including the assumption of debt and other liabilities. This announcement follows the termination of the previously agreed merger agreement between WMB and Williams Partners L.P. ("WPZ"). The business combination between ETE and WMB was approved by the Boards of Directors of both entities. The combination will create the third largest energy franchise in North America and one of the five largest global energy companies. The combination will also benefit customers by enabling further investments in capital projects and efficiencies that would not be achievable absent the transaction.

Under the terms of the transaction, Energy Transfer Corp LP ("ETC"), an affiliate of ETE, will acquire Williams at an implied current price of $43.50 per Williams share. Williams' stockholders will have the right to elect to receive as merger consideration either ETC common shares, which would be publicly traded on the NYSE under the symbol "ETC", and / or cash. Elections to receive ETC common shares and cash will be subject to proration. Cash elections will be prorated to the extent they exceed $6.05 billion in the aggregate and stock elections will be prorated to the extent the full $6.05 billion cash pool is not utilized. Williams stockholders electing to receive stock consideration will receive a fixed exchange ratio of 1.8716 ETC common shares for each share of WMB common stock, before giving effect to proration. If all Williams' stockholders elect to receive all cash or all stock, then each share of Williams common stock would receive $8.00 in cash and 1.5274 ETC common shares. In addition, WMB stockholders will be entitled to a special one-time dividend of $0.10 per WMB share to be paid immediately prior to the closing of the transaction. The special one-time dividend is in addition to the regularly scheduled WMB dividends to be paid before closing.

***

To address any uncertainty as to how the newly listed ETC common shares, as a new security, will trade relative to ETE common units, ETE has agreed that, as part of the merger consideration, each ETC share will have attached to it one contingent consideration right ("CCR"). In the event the ETC common shares trade at a discount to the ETE common units on a daily volume-weighted average basis over the 23-month period following the 20th trading day after the closing of the transaction, ETC will make a one-time payment in an amount equal to such volume-weighted price differential (the "Shortfall Amount"). Any Shortfall Amount will be settled in ETC common shares (at the then current value) or cash

31

at ETE's election, and ETE will issue a proportionate amount of Class E common units to ETC. If ETC common shares trade at a premium to ETE common units over the same 23-month period, the CCR will expire with no value and a portion of the ETE Class E common units held by ETC will be cancelled based on the volume weighted average price differential, thereby reducing ETC's ownership interest in ETE. There is also an automatic termination provision of the CCR if ETC trades above ETE on a daily VWAP basis for 20 consecutive trading days and there is no Shortfall Amount outstanding at the end of that 20 trading day period.

### The Market Reacts Harshly to the Merger

95.    Following the announcement of the Merger, shares of WMB were crushed.  On Friday, September 25, 2015, the last trading day prior to the announcement, WMB shares closed at $41.60.  At the end of the trading day on Monday, September 28, 2015, WMB shares closed at $36.56, a one day decline of over 12%.  The Company's shares fell again on September 29, 2015, to close at $34.93, a 16% decline over that two-day period.

96.    The implied deal price of $43.50 represented a paltry premium of 4.6% over WMB's September 25, 2015 closing price, and is a 28.5% discount to the Company's 52-week high of $60.86 on June 22, 2015.  And because the deal consideration is not bound by a collar, the value of the deal for WMB shareholders has fallen steeply since the Merger's announcement. With ETE's share price closing at $13.74 on December 31, 2015, the implied share price for WMB shareholders is $25.72 per share.  The $25.72 implied share price is a 40.9% discount to the $43.50 implied deal price announced on September 28, 2015 and is a 59.8% discount to ETE's original implied deal price of $64.00.

97.    The WMB Board's negotiation of the Proposed Transaction was a master class in how NOT to maximize shareholder value.  As early as May 19, 2015, ETE had proposed to acquire WMB shares for $64.00 per share, over ***47% higher*** than the eventual deal price of $43.50 (based on ETE's share price on September 25, 2015).  WMB reiterated the $64.00 offer

on June 10 and June 18, 2015, yet the Board spurned each of these offers.  Instead of accepting ETE's $64.00 proposal, on June 21, 2015, WMB announced a process "to explore a range of strategic alternatives."  The press release announcing the process further stated that the Board "carefully considered the unsolicited proposal and determined that it significantly undervalues Williams and would not deliver value commensurate with what Williams expects to achieve on a standalone basis and through other growth initiatives, including the pending acquisition of WPZ."  The fact that the Board summarily rejected ETE's $64.00 offer as undervalued, but just a few months later accepted an offer worth $43.50 (over 32% less than the original $64.00 offer) is mystifying.  Indeed, it is not surprising that a majority of the Board initially voted against ETE's proposal on September 23, 2015.  These actions are the polar opposite of those expected of a Board charged with maximizing shareholder value and thus represent a breach of the Board's fiduciary duties.

### The Structure of the Deal is Unfair to WMB Shareholders

98.     The Proposed Transaction's complicated structure was designed to mask the fact that the ETC shares to be received by WMB shareholders are an inadequate substitute for their WMB shares.  The Proxy summarizes the structure of the Merger as follows:

> Pursuant to the merger agreement, WMB will merge with and into ETC (the "merger"), with ETC surviving the merger. Immediately thereafter, LE GP will merge with and into ETE GP (the "GP merger" and, together with the merger, the "mergers"), with ETE GP surviving the GP merger and becoming the general partner of ETE.

> Immediately following the completion of the mergers, ETC will contribute substantially all of the assets and liabilities it assumed from WMB through the merger to ETE (the "WMB Contribution" and, together with the merger and the other transactions contemplated by the merger agreement, the "merger transactions") in exchange for the issuance by ETE to ETC of a number of ETE Class E units equal to (i) the number of ETC common shares issued to the WMB stockholders in the merger plus (ii) the number of ETC common shares issued to ETE in consideration for the Parent Cash Deposit (as defined below).

33

Immediately following the effective time of the mergers, ETC will contribute an amount of cash to ETE GP (the "GP Contribution"), which ETE GP will contribute to ETE in exchange for newly issued ETE common units and general partner units in ETE. As a result of the GP Contribution, the percentage interest in ETE that will be owned by ETE GP after completion of the merger transactions will equal the percentage interest in ETE owned by LE GP immediately prior to the merger transactions.

In connection with the merger, ETE will acquire a number of ETC common shares equal to (i) (a) the share consideration (as defined below) multiplied by (b) the aggregate number of shares of WMB common stock issued and outstanding as of the closing date of the merger (the "closing date"), multiplied by (c) $8.00 (we refer to this amount as the "cash component") divided by (ii) the cash consideration (as defined below), in exchange for the amount of cash needed by ETC to fund the cash portion of the merger consideration (the "Parent Cash Deposit"). As a result, based on the number of shares of WMB common stock outstanding as of the date of this proxy statement/prospectus, ETE will own approximately 19% of the outstanding ETC common shares immediately after the effective time of the merger (the "effective time")…

99.    In sum, the structure of the merger provides that WMB shareholders will be receiving shares of ETC in connection with the Proposed Transaction, but the value of those shares is inferior to their WMB shares.   ETC is a newly-formed, taxable master limited partnership that has never traded on a stock exchange.   While a major advantage of master limited partnerships is the fact that they are tax deferred, ETC's taxable status sacrifices that advantage while burdening shareholders with the master limited partnership structure.   ETC is controlled by Energy Transfer Corp GP, LLC ("ETC GP"), an entity controlled by ETE chairman Kelcy Warren.   Under Delaware law, limited partnerships do not owe traditional corporate fiduciary duties to shareholders (other than the contractual duties of good faith and fair dealing), and WMB shareholders will be giving up corporate fiduciary duty protections as a result of the Merger.   As ETC shareholders, former WMB shareholders will give up substantial voting rights in the new company and will not be entitled to replace directors.   Because of this loss of control in WMB shareholders' investment, the Board was charged with a *Revlon* duty to

maximize shareholder value.  As argued herein, the Board breached its *Revlon* duties by failing to maximize shareholder value.

100.    In an effort to address concerns about ETC's valuation, ETE agreed to attach one CCR to each ETC common share.  As the Proxy explains:

> The CCR will provide each CCR holder with the right to receive ETC common shares or a cash payment, at ETE's election, should the average of the daily volume-weighted average price for common units representing limited partner interests in ETE (the "ETE common units") on the New York Stock Exchange ("NYSE") ("ETE common units VWAP") be greater than the average of the daily volume-weighted average price for ETC common shares on the NYSE ("ETC common shares VWAP") for a period of 23 months following the 20th trading day after the closing date of the merger (the "measurement period"). If the ETC common shares VWAP is less than the ETE common units VWAP for the measurement period (such difference, a "shortfall amount"), then each outstanding CCR will be automatically cancelled and converted into the right to receive a shortfall payment, which will be settled in ETC common shares or cash, at ETE's election, and ETE will issue a number of ETE Class E units to ETC equal to the number of ETC common shares so issued, if any. If, however, the ETC common shares VWAP is equal to or greater than the ETE common units VWAP for the measurement period, then each outstanding CCR will be immediately and automatically cancelled and no consideration of any kind will be delivered to CCR holders, and ETE will cancel a portion of the ETE Class E units held by ETC based on the amount of such difference, thereby reducing ETC's ownership interest in ETE. The CCRs will be automatically cancelled and extinguished prior to the end of the measurement period, without any consideration of any kind being delivered to the CCR holders, if (1) the ETC common shares VWAP is greater than the ETE common units VWAP for 20 consecutive trading days and (2) the ETC common shares VWAP is equal to or greater than the ETE common units VWAP for a period beginning on the twenty-first trading day after the effective date of the merger and ending on the twentieth such trading day as mentioned above. The CCRs will trade with the ETC common shares and will not be separable or separately traded and will have no separate voting rights.

101.    The CCRs are not separately tradeable, will not be payable for two years, and are conditioned in a manner such that their receipt by WMB shareholders is highly questionable.  By the terms of the CCRs, if the volume-weighted average price ("VWAP") of ETC common shares is equal to or greater than the ETE common units VWAP for any consecutive 20 day period

during the two year CCR agreement period, then the CCRs will be cancelled.  Additionally, if the daily volume-weighted average price for ETC common shares on the NYSE ("ETC common shares VWAP") during the 23 months following the 20th trading day after the closing date of the merger (the "measurement period") is equal to or greater than the ETE common units VWAP for that period, then the CCRs will be cancelled, and ETE would also cancel a portion of the ETE Class E units held by ETC based on the amount of such difference, thereby reducing ETC's ownership interest in ETE.  This would ultimately reduce the already paltry merger consideration to be received in connection with the Proposed Transaction.

***The Termination of the WPZ Merger Was Detrimental to WMB Shareholders***

102.    As noted above, while neither Party A nor Party B's proposals required WMB to cancel the WPZ merger, ETE's offer was expressly premised on the termination of the WPZ deal.

103.    Unlike the Proposed Transaction, the WPZ merger was unanimously approved by WMB's Board.  In the May 13, 2015 press release announcing the WPZ merger, WMB CEO Armstrong touted the benefits of the combination:

> This strategic transaction will provide immediate benefits to Williams and Williams Partners investors. We continue to see an expanding portfolio of projects to connect the best supplies of natural gas and natural gas products to the best markets. The lower cost of capital and improved tax benefits expected from this transaction increase our confidence in extending the duration of our expected 10 percent to 15 percent dividend growth rate through 2020.
>
> This transaction simplifies our corporate structure, streamlines governance and positions Williams for strong investment-grade credit ratings. We anticipate significant market valuation upside and lower cost of capital for new fee-based growth projects along with incremental growth through strategically aligned M&A activities. Our roster of large-scale, fully contracted infrastructure projects will drive extraordinary adjusted EBITDA growth from an expected $5.4 billion in 2016 to $6.8 billion in 2018.

104.   WMB's acquisition of WPZ was greeted with enthusiasm by the market.  When the deal was announced, WMB's share price rose from $50.10 the prior trading day to close at $53.21 per share, a 6.5% increase.   Industry analysts were similarly positive.   Wells Fargo analysts stated that they "view[ed] the deal as a net long-term positive for both entities."  J.P. Morgan's analysis of the WPZ merger noted that it "should be viewed favorably given higher and extended dividend growth."   A number of other analysts were similarly bullish on the combination.  But because ETE's proposal required the termination of the WPZ merger, the positive benefits of the combination of these highly complementary entities will never be realized.

105.   Moreover, WMB will be required to pay a termination fee of $428 million in connection with the termination of the WPZ merger agreement.  Interestingly, the WPZ merger agreement contained a clause requiring that, in the event that the "Parent" (WMB) received a "Parent Designated Proposal" (defined as an offer "which is on terms and conditions which the Parent Board determines in good faith to be more favorable to Parent's stockholders from a financial point of view than the transactions contemplated by" the WPZ merger agreement), WMB was required to renegotiate in good faith with WPZ to attempt to arrive at a deal that would be more favorable to shareholders.

106.   In yet another act displaying the Board's favoritism towards ETE, WMB's directors made no attempt to renegotiate the terms of the WPZ merger agreement.  Instead, the Proxy notes that on September 25, 2015, WMB's legal counsel called WPZ's legal counsel:

> to provide notification that the WMB Board intended to change its recommendation of the WPZ merger agreement and that representatives of WMB and its outside advisors were available to negotiate in good faith with the WPZ conflicts committee and its advisors (to the extent the WPZ conflicts committee desired to negotiate) to make such adjustments in the terms and conditions of the

WPZ merger agreement so that the WMB Board would not be obligated to change
its recommendation.

107.    After negotiations between WMB and WPZ, the matter was resolved on
September 27, 2015 when the WPZ conflicts committee agreed to terminate the WPZ merger
agreement in exchange for an increase in the termination fee payable thereunder from $410
million to $428 million.  Thus the Board's refusal to negotiate with WPZ not only resulted in the
failure to produce an agreement with that company that would have benefited WMB
shareholders in the form of a combined WMB/WPZ.  It also cost WMB shareholders an
additional $18 million on top of the $410 million WMB had already agreed to pay WPZ as a
termination fee.

### Directors Meister and Mandelblatt are Conflicted

108.    Additionally, two of the Individual Defendants, Meister and Mandelblatt, have
conflicts arising from their respective involvement with and ownership of Corvex and Soroban.
As discussed above, Meister is the managing partner and chief investment officer of Corvex, and
also controls Corvex's general partner.   Mandelblatt is the managing partner and chief
investment officer of Soroban's investment manager, and also controls Soroban's general
partner.  As head of major investment firms, Meister and Mandelblatt could not have submitted a
disinterested vote in favor of the Merger without considering these other investment interests.

109.    Collectively, Corvex and Soroban own and control 8.36% of WMB common
shares and have agreed to coordinate their activities with respect to WMB, according to a
Schedule 13D filed on December 4, 2013.  When taken together, Corvex and Soroban effectively
own over 62 million shares of WMB common stock, making the group WMB's largest
shareholder.  As of November 13, 2015, Corvex owned 41,682,960 shares of WMB (acquired at
an average price of $37.80 per share), and Soroban owned 21,000,000 shares of WMB (acquired

at an average price of $34.62 per share). Thus, based on the Merger's implied price of $43.50 per WMB share, Corvex and Soroban stood to realize profits of approximately $237 million and $186 million, respectively, if the Proposed Transaction were consummated.

110.    Moreover, on February 25, 2014, Corvex, Soroban, Meister, Mandelblatt, and the Company entered into a Settlement Agreement which provided, among other things, that WMB would increase the size of its Board in order to appoint both Meister and Mandelblatt as directors. The Settlement Agreement also provided that Corvex and Soroban *must* vote their combined 8.36% of voting power in accordance with any Board recommendation with respect to any matter subject to a stockholder vote other than an election of directors. Here, Meister and Mandelblatt both voted in favor of the Merger, resulting in a majority approval by the Board. In turn, upon a stockholder vote, Corvex and Soroban *must* vote their combined 8.36% of voting power in favor of the Merger as well. As WMB's largest shareholder group, Soroban and Corvex's voting power is quite significant.

111.    In sum, Meister and Mandelblatt had substantial motivating factors to ensure that the Merger would be approved by a majority of the Board, as they already knew that 8.36% of WMB common shares would vote in conjunction with the Board's approval of the Merger, a transaction that would yield substantial profits for Corvex and Soroban if approved. Based on these inherent conflicts, Meister and Mandelblatt were not disinterested when they voted to approve the Merger and did not act in the best interests of WMB stockholders.

*The Financial Advisors' Conflicts and Their Failure to Opine on WMB's Standalone Prospects*

112.    The willingness of Barclays to issue a fairness opinion in regards to the Merger is unsurprising due to its extreme conflicts of interest. Barclays has performed a staggering amount

of work for ETE in the past, which is disclosed as follows in the fairness opinion included in the

Proxy:

> Further, since 2012, we have performed investment banking and financial services for ETE and its affiliates in connection with the following transactions: (1) ETE's $700 million tack-on term loan entered into in May 2014; (2) ETE's $900 million term loan entered into in November 2013; (3) ETE's $450 million high yield senior debt offering in January 2013; (4) Energy Transfer Partners L.P.'s ("ETP") acquisition of Regency Energy Partners LP in April 2015; (5) ETP's December 2014 acquisition of an interest in the Bakken pipeline project from ETE in an asset swap; (6) ETP's November 2014 "At-the-Market" equity offering program of up to $1.5 billion; (7) the approximately $800 million drop down of businesses from ETP to Susser Holdings Corporation in September 2014; (8) ETP's acquisition of Susser Holdings Corporation in August 2014; (9) ETP's $577 million equity offering in April 2013; (10) ETP's $600 million block equity offering in June 2012; (11) ETP's $590 million follow-on equity offering in November 2011; (12) Regency Energy Partner L.P.'s ("Regency") $700 million offering of senior unsecured notes in October 2014; (13) Regency's acquisition of assets relating to the Midstream business from Eagle Rock Energy Partners, L.P. in July 2014 and December 2013; (14) Regency's exchange offer in July 2014 for Eagle Rock Energy Partners, L.P.'s 8.375% notes due 2019; (15) Regency's $400 million equity offering program in June 2014; (16) Regency's offering of $600 million 4.5% senior notes due 2023 in April 2013; (17) Regency's $700 million senior notes offering in September 2012; (18) Regency's $269 million and $209 million share follow-on offerings in March 2012 and October 2011 respectively; (19) Sunoco Logistics Partners L.P.'s August 2015 $1 billion equity offering program; (20) Sunoco Logistics Partners L.P.'s amended $2.5 billion credit facility entered into in March 2015; (21) Sunoco Logistics Partners L.P.'s $564 million equity offering in March 2015 and $373 million follow-on offering in September 2014; (22) Sunoco Logistics Partners L.P.'s $1.0 billion senior notes offering in March 2014; (23) Sunoco Logistics Partners L.P.'s $200 million extension of its revolving credit facility in August 2013; (24) Sunoco LP's $370 million equity offering in October 2014; (25) Sunoco LP's acquisition of Aloha Petroleum, Ltd. in December 2014; (26) Sunoco LP's IPO in September 2012; (27) Sunoco Logistics Partners L.P.'s $600 million loan facility in July 2011; and (28) certain other investment banking and financial services matters.

113. Barclays disclosed these conflicts to the WMB Board, and thus the Board should

have known that Barclays would have loyalties to ETE.   Despite these conflicts, WMB

continued to employ Barclays as its financial advisor in connection with the Proposed

Transaction.   The Board's reliance on Barclays to provide unbiased, disinterested financial

advice with respect to the Company's strategic alternatives review process and with respect to the Proposed Transaction was thus unreasonable.

114.    At one point early in the strategic review process, WMB management proposed the retention of a separate financial advisor to evaluate standalone alternatives.  The Board, however, decided that its own handpicked advisors, Barclays and Lazard, should perform the standalone analysis in addition to the work these advisors were already conducting as part of the strategic review process.  And despite the fact that Barclays and Lazard were the only outside advisors who analyzed WMB's standalone prospects, the advisors' rendered no opinions as to the value of the Company's standalone prospects in comparison with the Proposed Transaction. As Barclays stated in its written fairness opinion:

> Our opinion does not address the relative merits of the Proposed Transaction as compared to any other transaction or business strategy in which the Company might engage.

Similarly, Lazard's written fairness opinion states:

> In addition, our opinion does not address the relative merits of the Transaction as compared to any other transaction or business strategy in which the Company might engage or the merits of the underlying decision by the Company to engage in the Transaction.

115.    Notably, the Proxy discloses that the bulk of Lazard's fee is contingent upon the closing of the Merger:

> For acting as financial advisor to WMB in connection with the merger, Lazard will receive a fee for such services in the amount of $23 million, plus a discretionary amount to be agreed at the discretion of the WMB Board to appropriately compensate Lazard in the light of the magnitude and complexity of the transaction. A portion of Lazard's fee has been payable since June 2015 as a monthly fee in the amount of $500,000 per month. A further $2.5 million of Lazard's fee became payable upon the rendering of Lazard's opinion. The remainder of Lazard's fee is contingent upon the closing of the merger.

41

With millions of dollars in compensation dependent on the closing of the merger, it is unsurprising that Lazard did not advocate for WMB's standalone prospects.

116.    Thus, the two financial advisors that were hired to evaluate the Company's prospects as a standalone entity offered no formal opinion as to whether the Proposed Transaction would offer better returns than the Company's standalone prospects.

### The Proxy Omits Material Information

117.    On November 24, 2015, WMB filed the Proxy with the SEC in connection with the Proposed Transaction.  The Proxy fails to provide the Company's stockholders with material information about the Proposed Transaction, thereby rendering Plaintiff and the Class unable to make an informed decision as to whether to vote in favor of the Proposed Transaction.

118.    Of primary concern to shareholders, the Proxy does not provide an adequate description of the Board's voting process to approve the Merger.  Specifically, the Proxy does not provide sufficient information regarding the Board's initial vote to reject the Merger.  On September 24, 2015, a majority of the Board initially voted against the Merger, yet the Proxy fails to provide any description of the Board's rationale and reasoning for rejecting the Proposed Transaction.  The Proxy does not even provide a summary of these discussions to substantiate the Board's disapproval.  Further, the Proxy does not provide any reason why the Board split into two groups following this initial vote to continue discussions, who was in each group, or any other information related to the dinner meetings on September 24, 2015.  The Proxy also provides no additional information as to why Board members Cleveland and Stoney decided to change their vote after the dinner meetings, which ultimately lead to the WMB Board's approval of the Merger.

119.     The Proxy also omits material information concerning the strategic review process.  Specifically, the Proxy fails to:

(a) provide details on WMB's July 22, 23, and 24, 2015 meetings with WMB stockholders, including whether WMB stockholders supported WMB's strategic review approach;

(b) discuss the implied value of Party A or Party B's July 27, 2015 proposals to acquire all of the shares of WMB common stock;

(c) note that ETE's revised offer on July 27, 2105 resulted in a decrease of almost $10 per WMB share; and

(d) provide information on Party C's offer in purchasing the publicly held outstanding common units of WPZ at a premium or any other details of the proposal and why the Board determined that Party C's offer was not a viable alternative.

120.     Additionally, the Proxy does not state why WMB agreed to pay a termination fee to WPZ in excess of the amount specified in the WPZ merger agreement.  Though the WPZ merger agreement contained a clause requiring WMB to renegotiate in good faith with WPZ to attempt to arrive at a deal that would be more favorable to shareholders in the event WMB received a "Parent Designated Proposal," the Board made no such effort to renegotiate the WPZ merger agreement.  There is also no explanation as to why and how the Board determined $18 million to be the appropriate increase for the WPZ termination fee.

121.     The Proxy also fails to include:

(a) the "certain key concerns with ETE's proposed structure of the CCRs" noted by Barclays and Lazard at the August 28, 2015 meeting of the strategic review committee;

(b)     any additional information on the "hell or high water" regulatory standard included in ETE's initial offer;

(c)     any discussion of what "the existing conditions in the market for natural gas liquids" were and whether these conditions would affect a combination between WMB and ETE positively or negatively; and

(d)     whether WMB and ETE's discussions related to the governance of ETC included any discussions about the employment of WMB employees in the combined entity.

122.    Moreover, the Proxy does not adequately discuss the strategic review committee and the Board's advisors' concerns about the economic equivalence of ETC common shares and ETE common units.  While the Proxy noted that the Board's financial advisors had significant concerns about the Proposed Transaction's valuation of ETC shares, there is no further discussion or analysis of the financial advisors' potential solutions to this equivalence issue.

123.    In addition to the omissions stated above, the Proxy also fails to disclose certain elements of the fairness opinions and financial analyses performed by Barclays and Lazard and presented to the Company:

(a)     with regard to the Dividend Discount Model Analyses performed by Barclays for WMB, ETE, and ETC, the Proxy fails to disclose how the terminal dividend yields and the equity discount rates were derived,

(b)     with regard to the Dividend Discount Analysis performed by Lazard for WMB, the Proxy fails to disclose how the range of equity discount rates were derived,

(c)      with regard to the projections for WMB, ETE, and ETC, the Proxy fails to disclose the full list of line items (i.e. revenue, EBIT, EBITDA, taxes, etc.) that would complete the picture of the projections for the shareholders, and

(d)      the Proxy fails to disclose any financial projections or strategies used by Barclays and Lazard in their respective analyses of any potential standalone strategic alternatives and valuations of WMB.

**The Proposed Transaction's Unfair Deal Protections**

124.   Furthermore, and in violation of the Individual Defendant's duty to maximize stockholder value, the Merger Agreement contains certain terms designed to favor the Proposed Transaction and deter any alternative bids.   These deal protection provisions all but ensure consummation of the Proposed Transaction.

125.   First, the Merger Agreement prescribes a termination fee (the "Termination Fee") that would require WMB to pay *$1.48 billion* (approximately 4% of the Merger's implied value) to ETE under certain circumstances, which include WMB accepting a competing proposal from any third party bidder or the Board changing its recommendation of the merger to WMB stockholders.

126.   Moreover, if WMB stockholders simply choose to vote against the Merger for any reason, which is their right, WMB will be required to reimburse ETE for all out-of-pocket fees and expenses incurred by ETE in connection with the Proposed Transaction, up to $50 million. With ETE's deteriorating share price likely resulting in an implied deal price that is a substantial discount to WMB's trading price, it is increasingly likely that WMB shareholders will reject the deal, thereby triggering ETE's right to reimbursement of out-of-pocket fees and expenses.

127.     The Merger Agreement also contains a strict "no shop" provision which restricts WMB's ability to solicit or discuss any alternative offers with potential third parties.   This provision, coupled with the lack of a "go shop" provision that would allow WMB to actively seek alternative offers and receive market feedback, substantially deters any outside bidders from genuinely competing with the terms of the Proposed Transaction.

128.     In addition, with respect to any unsolicited competing offer, WMB and the Individual Defendants agreed to a "matching rights" provision in the Merger Agreement.   In the event that WMB receives an unsolicited offer from a third party, WMB must notify ETE of the offer's material terms and information within 24 hours.   Further, in the event that WMB determines such an offer to be a superior alternative to the Proposed Transaction, ETE must be given three business days to renegotiate the terms of the Merger prior to the Board effecting a recommendation change.

129.     Thus, these protective deal provisions significantly limit the ability of WMB stockholders to receive a fair and competitive price for their shares, while also overly favoring the Proposed Transaction and the terms of the Merger Agreement.

**THE FIDUCIARY DUTIES OF THE DEFENDANTS**

130.     By reason of the Individual Defendants' positions with the Company as officers and/or directors, said individuals are in a fiduciary relationship with Plaintiff and the other public stockholders of WMB and owe Plaintiff and the other members of the Class a duty of care, loyalty, good faith, candor, and independence.

131.     By virtue of their positions as directors and/or officers of WMB, the Individual Defendants, at all relevant times, had the power to control and influence, and did control and influence and cause WMB to engage in the practices complained of herein.

132.   To diligently comply with their fiduciary duties, the Individual Defendants may not take any action that: (a) adversely affects the value provided to the Company's stockholders; (b) favors themselves or discourages or inhibits alternative offers to purchase control of the corporation or its assets; (c) adversely affects their duty to search and secure the best value reasonably available under the circumstances for the Company's stockholders; (d) will provide the Individual Defendants' with preferential treatment at the expense of, or separate from, the public stockholders; and/or (e) contractually prohibits the Individual Defendants from complying with or carrying out their fiduciary duties.

133.   In accordance with their duties of loyalty and good faith, the Individual Defendants are obligated to refrain from participating in any transaction where the Individual Defendants' loyalties are divided or where the Individual Defendants receive, or are entitled to receive, a personal financial benefit not equally shared by the public stockholders of the corporation.

134.   Plaintiff alleges herein that the Individual Defendants, separately and together, in connection the with the Proposed Transaction, are knowingly or recklessly violating their fiduciary duties, including their duties of care, loyalty, good faith, and independence owed to the Company, or are aiding and abetting others in violating those duties.

135.   In a situation where the directors of a Delaware company undertake a transaction that may result in a change in corporate control, the directors must take all steps reasonably required to maximize the value stockholders will receive rather than use a change of control to wrongfully benefit themselves.

136.    The Individual Defendants also owe the Company's stockholders a duty of candor, which includes the disclosure of all material facts concerning the Proposed Transaction and, particularly, the fairness of the price offered for the stockholders' equity interest.  The Individual Defendants are knowingly or recklessly breaching their fiduciary duties of candor by failing to disclose all material information concerning the Proposed Transaction and/or aiding and abetting other Defendants' breaches.

137.    In a situation where the directors of a Delaware company undertake a transaction that may result in a change in corporate control, the directors must take all steps reasonably required to maximize the value stockholders will receive rather than use a change of control to wrongfully benefit themselves.

## CLASS ACTION ALLEGATIONS

138.    Plaintiff brings this action on its own behalf and as a class action pursuant to Federal Rules of Civil Procedure Rule 23 on behalf of all holders of WMB common shares who are being and will be harmed by Defendants' actions described herein (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendants.

139.    This action is properly maintainable as a class action.

140.    The Class is so numerous that joined of all members is impracticable. According to the Company's latest From 10-Q filed with the SEC on October 29, 2015, WMB has over 749 million shares of common stock outstanding, likely owned by thousands of stockholders.

141.    There are common questions of fact and law including, *inter alia*, the following:

(a)     whether the Defendants have breached their fiduciary duties with respect to Plaintiff and the other members of the class in connection with the Proposed Transaction;

(b)     whether the Defendants have breached their fiduciary duty to obtain the best price available for the benefit of Plaintiff and other members of the Class in connection with the Proposed Transaction;

(c)     whether the Defendants omitted and misrepresented material information in the Proxy in violation of their fiduciary duties owed by them to Plaintiff and other members of the Class;

(d)     whether Plaintiff and the other members of the Class will be damaged irreparably upon consummation of the Proposed Transaction.

142.    Plaintiff's claims are typical of the claims of the other members of the Class, and Plaintiff does not have any interests adverse to the Class.

143.    Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

144.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

145.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate relief sought herein with respect to the Class as a whole.

## COUNT ONE

**Claim for Breach of the Fiduciary Duty of Candor Against All Individual Defendants**

146.    Plaintiff repeats and realleges each and every allegation set forth above, as if set forth fully herein.

147.    In their positions as WMB directors and/or officers, the Individual Defendants have violated their fiduciary duty of candor owed to the public stockholders of WMB. In connection with a sale of the Company, Individual Defendants were required to comply with their fiduciary duty of candor by fully and adequately informing WMB's public stockholders.

148.    Individual Defendants failed to fulfill their fiduciary duties in connection with the Proposed Transaction by causing and allowing WMB to file a materially misleading and incomplete Proxy that, among other things, failed to adequately disclose material information concerning the sales process, the strategic review process, and the voting process.

149.    Because Individual Defendants dominate and control WMB's business and corporate affairs and are privy to private corporate information concerning WMB's assets, business operations, and future prospects, there exists an imbalance and disparity of knowledge and power between them and the public stockholders of WMB that makes it inherently unfair for them to pursue the Proposed Transaction without comply with their fiduciary duty of candor.

150.    As a result of Individual Defendants' breaches of the duty of candor, Plaintiff and the Class have been and will be irreparably harmed.  Unless the Proposed Transaction is enjoined by the Court, Individual Defendants will continue to breach their fiduciary duty of candor owed to Plaintiff and the other members of the Class by failing to make adequate disclosures of material information and denying WMB stockholders the opportunity to vote on the Proposed Transaction based on complete information.

151.    Plaintiff and other members of the Class have no adequate remedy at law.  Only through the exercise of the Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable harm that Individual Defendants' actions threaten to inflict.

## COUNT TWO

### Claim for Breach of Fiduciary Duties Against Defendants Cleveland, Izzo, MacInnis, Mandelblatt, Meister, Nance, Stoney and Sugg

152.    Plaintiff repeats and re-alleges each allegation set forth herein.

153.    Defendants Cleveland, Izzo, MacInnis, Mandelblatt, Meister, Nance, Stoney, and Sugg have violated their fiduciary duties of care, loyalty, good faith, and independence owed to the public stockholders of WMB.

154.    By the acts, transactions and courses of conduct alleged herein, Defendants Cleveland, Izzo, MacInnis, Mandelblatt, Meister, Nance, Stoney, and Sugg are attempting to unfairly deprive Plaintiff and other members of the Class of the true value of their investment in WMB.

155.    As demonstrated by the allegations above, Defendants Cleveland, Izzo, MacInnis, Mandelblatt, Meister, Nance, Stoney, and Sugg failed to exercise the care required, and breached their duties of loyalty owed to the stockholders of WMM, as they failed to take steps to maximize the value of WMB to its public stockholders by facilitating a flawed sales process and approving the Proposed Transaction.

156.    By reason of the foregoing acts, practices and course of conduct, these Defendants have breached their fiduciary obligations toward Plaintiff and the other members of the Class.

157.    As a result of the actions of these Defendants, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of

WMB's assets and businesses and have been and will be prevented from obtaining a fair value for their common stock.

158.    These Defendants are not acting in good faith toward Plaintiff and the other members of the Class, and have breached and are breaching their fiduciary duties to the members of the Class.  Unless the Individual Defendants are enjoined by the Court, they will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, all to the irreparable harm of the members of the Class.

159.    Plaintiff and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict.

## COUNT THREE

### Claim Against ETE Defendants For
### Aiding and Abetting Breaches of Fiduciary Duties

160.    Plaintiff repeats and re-alleges each allegation set forth herein.

161.    The ETE Defendants knowingly assisted, by reason of their status as parties to the Proposed Transaction, and their possession of non-public information, and have aided and abetted the Individual Defendants in the aforesaid breach of their fiduciary duties.  Such breaches of fiduciary duties could not and would not have occurred but for the conduct of the ETE Defendants.

162.    As a result of this conduct, Plaintiff and the other members of the Class have been and will be damaged in that they have been and will be prevented from obtaining a fair price for their shares.

163.    Plaintiff and the Class have no adequate remedy at law.

## COUNT FOUR

**Violation of Section 14(a) of the Exchange Act and Rule 14a-9 of the Securities and Exchange Commission Against the Individual Defendants and WMB**

164.    Plaintiff repeats and re-alleges each allegation set forth herein.

165.    The Individual Defendants and WMB disseminated the false and materially misleading Proxy, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

166.    WMB prepared, reviewed, and/or disseminated the Proxy following review, editing, and approval by the Individual Defendants.  Therefore, both the Company and Individual Defendants knew that the Proxy failed to disclose the aforementioned material information which rendered other statements made in the Proxy false and/or misleading.

167.    The omissions and false and misleading statements in the Proxy were material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Transaction. In addition, a reasonable investor would have viewed full and accurate disclosures as significantly altering the "total mix" of information made available in the Proxy and other information reasonably available to investors.

168.    As such and by reason of the foregoing, Individual Defendants and WMB violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

169.    Plaintiff and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict

## COUNT FIVE

**Violations of Section 20(a) of the Exchange Act Against All Defendants**

170.    Plaintiff repeats and re-alleges each allegation set forth herein.

171.    The Individual Defendants and ETE Defendants acted as controlling persons of WMB within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of the Company, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the false and misleading statements contained in the Proxy, they had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the false and misleading statements contained in the Proxy.

172.    Additionally, each of Individual Defendants, WMB, and ETE Defendants were provided with or had unlimited access to copies of the Proxy and the other statements alleged therein by Plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

173.    In particular, each of Individual Defendants had direct involvement in the day-to-day operations of WMB and, therefore, each is presumed to have had the power to control and influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.

174.    In addition, as the Proxy sets forth at length, and as described above, the Individual Defendants were each involved in the process for reviewing and approving the Proposed Transaction.  The Proxy purports to describe the various issues and information that they reviewed and considered, descriptions of which had input from the Individual Defendants.

175.    As set forth above, the Defendants had the ability to exercise control over, and did control, a person or persons who have each violated Section 14(a) of the Exchange Act and Rule

14a-9 promulgated thereunder, by their acts and omissions in connection with the false and materially misleading statements disseminated in the Proxy.

176.    By virtue of these facts, the Defendants have violated Section 20(a) of the Exchange Act and are liable to Plaintiff and the other members of the Class.

177.    Plaintiff and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Declaring this action to be a proper Class action and certifying Plaintiff as Class representatives and Plaintiff's counsel as Class counsel;

B.    Enjoining Defendants, their agents, counsel, employees, and all persons acting in concert with them from consummating the Proposed Transaction, unless and until the Company adopts and implements a procedure or process to obtain a merger agreement providing the best possible terms for stockholders;

C.    Rescinding, to the extent already implemented, the Proposed Transaction or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

D.    Directing the Individual Defendants to account to Plaintiff and the Class for all damages suffered as a result of the Individual Defendants' wrongdoing;

E.    Awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

F.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: January 19, 2016

**CHIMICLES & TIKELLIS LLP**

_/s/ Tiffany J. Cramer_

Pamela S. Tikellis (Bar No. 2172)
pst@chimicles.com
A. Zachary Naylor (Bar No. 4439)
zn@chimicles.com
Tiffany J. Cramer (Bar No. 4998)
tjc@chimicles.com
222 Delaware Avenue, 11th Floor
P.O. Box 1035
Wilmington, DE 19899
Phone: (302) 656-2500
Fax: (302) 656-9053

_Of Counsel:_

**SAXENA WHITE, P.A.**
Joseph E. White, III, Esq.
jwhite@saxenawhite.com
Jonathan M. Stein, Esq.
jstein@saxenawhite.com
Adam Warden, Esq.
awarden@saxenawhite.com
5200 Town Center Circle, Suite 601
Boca Raton, FL 33486
Telephone: (561) 394-3399
Fax:  (888) 458-9055

_Plaintiffs' Counsel_